IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

| | |
|---|---|
| JOEL TERENCE ABBOT, | ) |
| | ) Civil No. 03-1024-MO |
| Petitioner, | ) |
| | ) |
| v. | ) |
| | ) |
| GUY HALL, | ) |
| | ) OPINION AND ORDER |
| Respondent. | ) |

    Bryan E. Lessley
    Assistant Federal Public Defender
    151 W. 7th Avenue, Suite 510
    Eugene, Oregon 97401

        Attorney for Petitioner

    Hardy Myers
    Attorney General
    Lester R. Huntsinger
    Assistant Attorney General
    Department of Justice
    1162 Court Street NE
    Salem, Oregon 97310

        Attorneys for Respondent

///

MOSMAN, District Judge.

Petitioner brings this habeas corpus action pursuant to 28 U.S.C. § 2254. He challenges his underlying Murder conviction on approximately 79 grounds, most of which he abandons in this proceeding. For the reasons set forth below, the Petition for Writ of Habeas Corpus (#2) is denied, and this action is dismissed.

## **BACKGROUND**

In March of 1993, petitioner was convicted of killing Carolann Payne ("Payne"), a woman with whom he had been involved with romantically for several years during the 1980's. Sometime in the summer of 1985, Payne went missing without a trace. Her son last heard from her in the "[f]irst couple months of '85." Trial Transcript, Vol. II, pp. 81-84. Her doctor last saw her on March 8, 1985. Trial Transcript, Vol. III, p. 28. Kathryn Mullings, a former house-mate of Payne's, last saw her in June of 1985. Id at 75. Payne's sister last heard from her in June of 1985. Trial Transcript, Vol. II, pp 87-89. Her grandmother, with whom Payne kept in frequent touch, became worried in July of 1985 when she stopped hearing from her granddaughter. Id at 89.

Robin Eby, petitioner's ex-wife, last saw Payne in July of 1985 in petitioner's pickup truck. Trial Transcript, Vol. III, p. 4. In the fall of 1986, petitioner asked Eby if she wondered why she hadn't seen Payne for such a long time. Id at 6. He then told Eby that "he put a gun in her mouth and blew her head off.

Well, actually he said he blew her mouth off because she wouldn't shut up and leave him alone and he was sick of her . . . he told me he buried her under a Juniper tree where no one would ever find her." Id at 6.

In August of 1985, petitioner told a similar story to an acquaintance named Johnnie Lightfoot. Petitioner told Lightfoot that he "blew [Payne's] lips off because [he] got tired of listening to her . . . ." Trial Transcript, Vol. II, p. 93.

Francis Lewis was a friend of petitioner's who was engaged in divorce proceedings at the time of Payne's disappearance. Payne was expected to testify against Lewis as an eyewitness to spousal abuse, but in July of 1985, and again one month later, petitioner told Lewis that he "never had to worry about Carolann Payne testifying against [him]." Trial Transcript, Vol. I, pp. 179-180. Petitioner claimed that "he was fed up and shot her." Id at 181.

Troubled by these conversations, Lewis approached his divorce attorney and explained the situation to him. The attorney put Lewis in touch with the Bend Police Department, and Lewis agreed to become an informant for them. Id at 184. In secretly recorded conversations between 1985 and 1992, petitioner repeatedly admitted killing Payne. In 1992, he admitted many details, including that he used a 30-06 rifle which "blew up" her head. Petitioner's Exhibit 19, p. 9. He claimed to have disassembled and destroyed the rifle following the murder. Id at 7. He then buried her body

3 - OPINION AND ORDER

under a juniper tree where it couldn't be found. "Well, see its like this. If you knew EXACTLY where she was, you could go up there and look and you'd never find her. I mean, she's not visible above ground." Petitioner's Exhibit 29, p. 170 (emphasis in original).

Lewis was able to convince petitioner that he needed to find Payne's body in order to re-bury it in a more secure location. In a taped conversation at the scene of the crime, petitioner told Lewis "I shot her over there." Petitioner's Exhibit 17, p. 20. He then said, "After the fact that she laid over there and rotted. And then I brought her over here." Id. He told Lewis that she couldn't be found because "I don't think I can find her myself." Id. He continued to provide specific details about the condition of the body, noting that "[s]he was, uh, bones . . . she was intact, other than her head." Petitioner's Exhibit 19, p. 3. He also indicated that when he had returned to bury her approximately one month later, Payne's clothes had apparently rotted away. Id at 5. Despite several attempts, petitioner was never able to find Payne's body again. It remains missing to this day.

A jury convicted petitioner of Payne's murder, and the court sentenced him to life in prison with a 25-year minimum term. Respondent's Exhibit 101. He took a direct appeal, but the Oregon Court of Appeals affirmed without opinion and the Oregon Supreme Court denied review. State v. Abbott, 129 Or.App. 642, 881 P.2d

4 - OPINION AND ORDER

183, rev. denied, 320 Or. 325, 883 P.2d 1303 (1994). The U.S. Supreme Court denied certiorari. Abbot v. Oregon, 514 U.S. 1086 (1995).

Petitioner next filed for collateral relief, but Oregon's post-conviction trial court denied relief on all claims. Respondent's Exhibits 125 & 126. The Oregon Court of Appeals affirmed the lower court without opinion, and the Oregon Supreme Court again denied review. Abbott v. Baldwin, 183 Or.App. 533, 53 P.3d 471 (2002), rev. denied, 335 Or. 195, 64 P.3d 576 (2003).

Petitioner filed this habeas corpus action on July 28, 2003. In his *pro se* Petition, he presents approximately 79 grounds for relief. In his supporting memorandum, petitioner explicitly limits his grounds for relief to the following:

> 1. Trial counsel was ineffective when he failed to review the discovery, conduct appropriate investigation, and elicit evidence which would have undercut the State's attempts to corroborate the confessions made by him as related in testimony and in tape-recorded conversations, in particular by:
>
>     A. Failing to investigate and present evidence that, in the months leading up to her disappearance, the victim had repeatedly voiced thoughts of suicide, and that family members had told investigators that Ms. Payne had suffered suicidal ideation in the past for which she had been confined in a psychiatric hospital;
>
>     B. Failing to object to unqualified expert testimony by one of the State's witnesses, who opined that the alleged victim had not suffered death by accident or suicide, because if a death had been so caused, the body would have been found; and

5 - OPINION AND ORDER

> 2. Trial counsel failed to introduce evidence that would have refuted the testimony of State's witness Gordon Hansen that the victim was afraid of petitioner.

Memo in Support (#45), pp. 2-3.

Petitioner concedes that these claims are procedurally defaulted, but asks the court to excuse the default and reach the merits of his claims because he is actually innocent and therefore qualifies for the fundamental miscarriage of justice exception to procedural default.

## DISCUSSION

I. **Standards**.

In Schlup v. Delo, 513 U.S. 298 (1995), the Supreme Court addressed the process by which state prisoners may prove "actual innocence" so as to excuse a procedural default. The Court explained that in order to be credible, a claim of actual innocence "requires petitioner to support his allegations of constitutional error with new reliable evidence--whether it be exculpatory scientific evidence, trustworthy eyewitness accounts, or critical physical evidence--that was not presented at trial." Id. at 324; Downs v. Hoyt, 232 F.3d 1031, 1040 (9th Cir. 2000), cert. denied, 121 S.Ct. 1665 (2001). The Ninth Circuit has held that "habeas petitioners may pass Schlup's test by offering 'newly presented' evidence of innocence." Griffin v. Johnson, 350 F.3d 950, 963 (9th

6 - OPINION AND ORDER

Cir. 2003). The meaning of "newly presented" evidence is evidence that was not before the trial court. Id.

Ultimately, petitioner must prove that it is more likely than not that no reasonable juror would have found him guilty beyond a reasonable doubt. Schlup, 513 U.S. at 327; Bousley v. United States, 523 U.S. 614, 623 (1998); Downs, 232 F.3d at 1040. In making this determination, this court "must assess the probative force of the newly presented evidence in connection with the evidence of guilt adduced at trial." Schlup, 513 U.S. at 332.

**II. Analysis.**

In this case, petitioner presents evidence which, while previously discoverable, was not presented at trial and is therefore considered "new." See Griffin, *supra*. The new evidence includes Payne's medical records and police reports pertaining to her disappearance, both of which speak to her history of depression and thoughts of suicide. The records reveal that Payne had previously been hospitalized for three months following a mental breakdown, and her mother told police investigators that Payne "spent several years in the Broadlawns Hospital, Des Moines, Iowa [in] the Psychiatric section." Petitioner's Exhibit 129, pp. 253, 332. The newly presented records also include evidence that Payne's depression led her to attempt suicide in 1982. Id at 331.

One document presented for the court's review recounts a medical examination on January 8, 1985. On that date, Payne met with Dr. David A. Fredstrom, who noted that:

> Patient also very emotionally upset today. Patient apparently was engaged to a gentleman who had 2 children, one was a 2 year old boy. The 2 year old boy approximately 1 week ago was killed in an auto accident when the grandmother ran over him. Shortly after the boyfriend and the other child took off basically leaving Carolanne on her own. Patient states she has been living with another couple and has been crying frequently. Patient has been getting some support from the Mormon Church and apparently she plans to join that church.

Id at 254.[1]

Petitioner also submits a letter written to him by Payne in early March of an unidentified year (petitioner's brief assumes the year to be 1985). In that letter, Payne professes her love for petitioner and asks that he make her a part of his life again. Petitioner's Exhibit 130. The latter half of the letter contains an especially desperate tone wherein Payne indicates that she is just "drifting" and has never felt so alone. Id at 4a. Her letter also contains the following:

> Les + Kathy just got back from Bend and they said you were with Joni. They also said that you told Welfare you weren't with me anymore. Why? Now I really have nothing. No you, no money, no food, no nothing. Just a

---

[1] Petitioner claims that Payne met with Dr. Fredstrom on March 8, 1985, but the citation to March 8 in Dr. Fredstrom's notes appears only on the third page of the report and appears to be a typographical error. The first two pages of Dr. Fredstrom's notes both contain the January 8 date, one of these citations is hand-written.

> bunch of hungry mouths to feed.  The way I feel right now, I wish I could die, too.

Id at 4.

Contrary to his many previous admissions regarding Payne's disappearance, petitioner now claims that he did not kill her.  He asserts that evidence of Payne's history of depression and suicidal ideation point to suicide, not murder.  He also maintains that his vivid and disturbing admissions regarding the murder were merely attempts to impress others and make himself look important.

While petitioner may now claim that he was merely trying to impress people with a fabricated story, it makes no sense to lie about something so grave, especially when Payne's return to the community would have completely undermined petitioner's credibility among those he was trying to "impress."  In other words, in order to effectively perpetuate the alleged lie, petitioner must have known that Payne would never return.  He has not explained how he acquired this knowledge.

While petitioner's newly presented evidence does show that Payne suffered from depression and experienced thoughts of suicide, the new evidence is not exculpatory.  It is simply a theory of the case which does not effectively rebut petitioner's own numerous admissions of guilt.  The new evidence falls well short of leading the court to conclude that it is more likely than not that no reasonable juror would have convicted him given the new evidence he presents here.  Because petitioner fails to pass through the

gateway of actual innocence, his claims remain procedurally defaulted. Relief on the Petition is therefore denied.

## **CONCLUSION**

For the reasons identified above, the Petition for Writ of Habeas Corpus (#2) is DENIED, and this proceeding is DISMISSED, with prejudice.

IT IS SO ORDERED.

DATED this __19__ day of April, 2005.

                                 /s/Michael W. Mosman
                                 Michael W. Mosman
                                 United States District Judge